IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRIGITTE S. SWEENEY,              )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )    Civil Action No. 10-253-E
                                  )
COMMISSIONER OF SOCIAL SECURITY,  )
                                  )
            Defendant.            )

O R D E R

AND NOW, this 7th day of March, 2012, upon consideration
of Defendant's Motion for Summary Judgment (document No. 10) filed
in the above captioned matter on June 7, 2011,

IT IS HEREBY ORDERED that said Motion is DENIED.

AND, further, upon consideration of Plaintiff's Motion
for Summary Judgment (document No. 8) filed in the above captioned
matter on April 24, 2011,

IT IS HEREBY ORDERED that said Motion is GRANTED in part
and DENIED in part. Specifically, Plaintiff's Motion is granted to
the extent that it seeks a remand to the Commissioner of Social
Security ("Commissioner") for further evaluation as set forth below
and denied in all other respects. Accordingly, this matter is
hereby remanded to the Commissioner for further evaluation under
sentence four of 42 U.S.C. § 405(g) in light of this Order.

1

## I.   Background

Plaintiff Brigitte S. Sweeney filed her claim for Disability
Insurance Benefits ("DIB") under Title II of the Social Security
Act, 42 U.S.C. §§ 401-434, on April 4, 2006, and filed for
Supplemental Security Income ("SSI") under Title XVI of the
Social Security Act, 42 U.S.C. §§ 1381-1383f, on March 24, 2006.
Specifically, Plaintiff claimed that she became disabled on
December 26, 2005, due to "multiple mental illness[es], lower
back pain and foot pain." (R. 112).

After being denied initially on August 22, 2006, Plaintiff
sought, and obtained, a hearing before an Administrative Law
Judge ("ALJ") on March 24, 2008. (R. 52-56, 22-48). In a
decision dated August 5, 2008, the ALJ denied Plaintiff's request
for benefits. (R. 10-21). The Appeals Council declined to
review the ALJ's decision on August 30, 2010. (R. 1-3). On
October 19, 2010, Plaintiff filed a timely appeal with this
Court, and the parties have filed cross-motions for summary
judgment.

## II.   Standard of Review

Judicial review of a social security case is based upon the
pleadings and the transcript of the record. See 42 U.S.C. §
405(g). The scope of review is limited to determining whether
the Commissioner applied the correct legal standards and whether

2

the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. See Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive") (quoting 42 U.S.C. § 405(g)); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999) (noting that the court has plenary review of all legal issues, and reviews the administrative law judge's findings of fact to determine whether they are supported by substantial evidence).

"Substantial evidence" is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). However, a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). "Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." Id. at 317.

A disability is established when the claimant can demonstrate some medically determinable basis for an impairment

3

that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period. See Fargnoli v. Massanari, 247 F.3d 34, 38-39 (3d Cir. 2001). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ....'" Id. at 39 (quoting 42 U.S.C. § 423(d)(2)(A)) (emphasis in original).

The Social Security Administration ("SSA") has promulgated regulations incorporating a five-step sequential evaluation process for determining whether a claimant is under a disability as defined by the Act. See 20 C.F.R. §§ 404.1520, 416.920. In Step One, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. See 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, the disability claim will be denied. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). If not, Step Two of the process requires the Commissioner to determine whether the claimant is suffering from a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a),

4

416.921(a). If the claimant fails to show that his or her impairments are "severe," he or she is ineligible for disability benefits. If the claimant does have a severe impairment, however, the Commissioner must proceed to Step Three and determine whether the claimant's impairment meets or equals the criteria for a listed impairment. See 20 C.F.R. §§ 404.1520(d), 416.920(d). If a claimant meets a listing, a finding of disability is automatically directed. If the claimant does not meet a listing, the analysis proceeds to Steps Four and Five.

Step Four requires the Commissioner to consider whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work. See 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant bears the burden of demonstrating an inability to return to his or her past relevant work. See Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume his or her former occupation, the evaluation moves to the fifth and final step.

At Step Five, the burden of production shifts to the Commissioner, who must demonstrate that the claimant is capable of performing other available work in the national economy in order to deny a claim of disability. See 20 C.F.R. §§ 404.1520(g), 416.920(g). In making this determination, the Commissioner should consider the claimant's RFC, age, education, and past work experience. See id. The Commissioner must further

analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. See 20 C.F.R. §§ 404.1523, 416.923.

## III. **The ALJ's Decision**

In the present case, the ALJ found that Plaintiff met the insured requirements of the Social Security Act through March 31, 2009. (R. 12). Accordingly, to be eligible for DIB benefits, Plaintiff had to establish that she was disabled on or before that date. See 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101, .110, .131.

The ALJ then proceeded to apply the sequential evaluation process when reviewing Plaintiff's claim for benefits. In particular, the ALJ found that Plaintiff had not been engaged in substantial gainful activity since the alleged onset of disability. (R. 12). The ALJ also found that Plaintiff had the following severe impairments: osteoarthritis, arthropathy, chronic obstructive pulmonary disease, non-insulin dependent diabetes mellitus, depression, bipolar disorder, an anxiety disorder and a substance abuse disorder (in remission). (Id.). The ALJ concluded that Plaintiff's impairments did not meet any of the listings that would satisfy Step Three. (Id. at 13).

6

At Step Four, the ALJ found that Plaintiff retained the RFC to perform light work, except that she cannot operate foot controls; can perform no occupational driving; cannot be exposed to workplace hazards; with limited and superficial interaction with supervisors, co-workers and the public while being precluded from tasks that involve: arbitration, negotiation, confrontation and supervision. (Id. at 16). Based on this RFC, Plaintiff established that she is incapable of returning to her past employment; therefore, the ALJ moved on to Step Five. (Id. at 19). Vocational expert Samuel E. Edelman testified at the hearing that there were a significant number of jobs in the national economy that Plaintiff could perform given her limitations. (Id. at 19-21).

## IV. **Legal Analysis**

Plaintiff's contentions are two-fold: First, she argues that the ALJ erred by failing to discuss and reconcile seven of her global assessment of functioning ("GAF") scores, which ranged from 20 to 57, with his finding of non-disability. Second, she contends that the ALJ erred by failing to account for her inability to maintain regular attendance due to frequent hospitalizations and an inability to leave her home in January and February of 2008.

Defendant asserts that any error by the ALJ to specifically discuss the GAF scores was immaterial because (1) the GAF scores

7

correlated to Plaintiff's threats of suicide which do not relate directly to her ability to work and (2) the ALJ incorporated all of her credibly-established, work-related limitations in his RFC determination. After a review of the record, the Court agrees that a remand is warranted in this case. Specifically, the Court finds that the ALJ's failure to specifically discuss the seven GAF scores contained in the record was improper and precludes his determination from enjoying the support of substantial evidence in the record. Accordingly, the Court will remand the case for further consideration consistent with this Order.

GAF scores "are used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults." Irizarry v. Barnhart, 233 Fed. Appx. 189, 190 n.1 (3d Cir. 2007); See 65 F.R. 50746-01, 50764-65 (Social Security Administration Rules and Regulations). "The GAF scale, designed by the American Psychiatric Association, ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest." West v. Astrue, 2010 WL 1659712, at *4 (E.D. Pa. Apr. 26, 2010). Generally, a plaintiff's GAF score is not considered to have a "direct correlation to the severity requirements of the . . . mental disorder listings." 66 Fed. Reg. 50746, 50764-65. Nonetheless, the rules still note that GAF remains the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." Id. As such, "it constitutes medical

evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability." Wiggers v. Astrue, 2010 WL 1904015, at *8 (W.D. Pa. May 10, 2010) (quoting Watson v. Astrue, 2009 WL 678717, at *5 (E.D. Pa. Mar. 13, 2009)). Indeed, courts have recognized that "a GAF score at or below 40 *should be carefully considered* because such a low score reflects 'a major impairment in several areas such as work, family relations, judgment, or mood.'" Conklin v. Astrue, 360 Fed. Appx. 704, 707 n.2 (8th Cir. 2010) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 34 (4th ed., text rev. 2000)) (emphasis added).

Plaintiff's mental health treatment records contain seven GAF scores that range from 20 to 57. Despite the fact that six of the seven ratings reflected scores of 50 or below, the ALJ did not even allude to the low scores in his discussion and he did not explain how they were consistent with his finding of non-disability. In March of 2006, Plaintiff was seen by Dr. David J. Fontaine, one of her treating psychiatrists at Clarion Psychiatric Center. Dr. Fontaine assigned her a GAF score of 30[1] upon

---

[1] A GAF of 21 to 30 indicates that an individual's "[b]ehavior is considerably influenced by delusions or hallucinations" or the individual has a "serious impairment in communication or judgment ... or [an] inability to function in almost all areas." Pate-Fires v. Astrue, 564 F.3d 935, 940 n.5 (8th Cir. 2009) (quoting DSM-IV at 32). Scores between "41-50 indicates an individual has

admission and a 45 upon discharge.[2]  (Doc. No. 5-8 at 19).  On

July 23, 2007, Dr. Joseph C. Maisonneuve, Plaintiff's treating

psychiatrist at Clarion County Counseling Center, assigned her a

GAF score of 50 and noted that she had been noncompliant with her

medication and had failed to appear for her follow-up visits.[3]

(Id. at 49).  On August 23, 2007, Plaintiff was assigned a GAF

score of 57 by her mental health therapist Ms. Husak.[4]  (Id. at

47).  On September 19, 2007, Plaintiff was seen by Dr. Maisonneuve

---

serious symptoms (e.g., suicidal ideation, severe obsessional
rituals, frequent shoplifting) or any serious impairment in
social, occupational, or school functioning (e.g., no friends,
unable to keep a job)."  Rios v. Comm'r of Soc. Sec., 444 Fed.
Appx. 532, 534 (3d Cir. 2011).

[2] His treatment notes indicate that Plaintiff showed "some mild
psychomotor retardation," was "slow to answer," showed "some mild
flight of ideas and disorganization," but noted that "when
[Plaintiff was] forced to her thought processes are logical,
coherent and goal directed."  (Doc. No. 5-8 at 18).  He stated
that Plaintiff denied having any hallucinations or delusions, but
that she "is suicidal but doesn't know what she'd do to kill
herself."  (Id.).  Plaintiff was "capable of abstract thinking,"
but "refuse[d] to do any memory skills."  (Id.)

[3] His notes also reflect that Plaintiff was having problems
sleeping, that "she does thought erasing," and has "difficulty
concentrating."  (Id. at 48).  Her mental status examination
revealed fairly mild limitations, but Dr. Maisonneuve did report
that her "[m]ood was moderately elated with labile affect," that
her "insight and judgment [wa]s fair," and that her "speech was a
little pressured with no flight of ideas or looseness of
association."  (Id. at 49).  Patient did not threaten suicide
during this visit and was "able to do Serial 7 and Serial 3."
(Id.).

[4] A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat
affect and circumstantial speech, occasional panic attacks) OR
moderate difficulty in social, occupational, or school functioning
(e.g., no friends, unable to keep a job.)."  DSM-IV, at 34.

10

and was assigned a GAF score of 50.[5] (Id. at 46). He noted that Plaintiff's "[i]nsight and judgment are still poor," and that her affect was appropriate to the anxious mood she had described herself to be in. (Id.).

On November 20, 2007, Plaintiff again was seen by Dr. Maisonneuve at the Clarion Psychiatric Center and was assigned a GAF score of 30. (Doc. No. 5-9 at 10).[6] Dr. Maisonneuve observed that she was crying during the exam, was "ambivalent about suicidal or homicidal ideation," and "reported vague hallucinations but was unable to elaborate on the content." (Id. at 10). He indicated that her "[i]nsight and judgment are poor" and that her "[s]peech was a little pressured at times." (Id.).

On February 19, 2008, Plaintiff was seen by Dr. Radecki, another one of her treating psychiatrists at Clarion Psychiatric Center, who assigned her a GAF score of 20 upon admission and a 50 upon discharge.[7] (Doc. No. 5-8 at 58). Plaintiff was suicidal upon admission and stated that she was "thinking about taking all

---

[5] During this examination Plaintiff denied feeling suicidal. (Id. at 46).

[6] Plaintiff stated that she "has death wishes" and that "she wished she wouldn't wake up." (Id. at 8).

[7] A GAF score of 11-20 denotes "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement)...." Villarreal v. Astrue, 2011 WL 3021774, at *4 n.12 (C.D. Cal. 2011) (quoting AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 34 (4th ed., text rev. 2000)).

of her medications" just prior to admission. She stated she was "afraid of her temper," and complained of "restlessness, insomnia, racing thoughts," and said that "her head and body feels like a pinball machine." (Id. at 59). Dr. Radecki noted that she "is afraid to leave[] her house but doesn't know why. She feels that her medications are no longer working." (Id.). He indicated that Plaintiff "has been off cocaine and alcohol completely since October 2007" and that she has to take sleeping tablets "in an effort to sleep and calm her nerves." (Id.). He observed that "her speech was pressured and loud," that she "was very tearful," "hopeless and tense," and "extremely anxious." (Id.). He stated that she has been "diagnosed bipolar in the past and has considerable number of obsessive compulsive behaviors." (Id.).

Upon examination of Plaintiff's mental status, Dr. Radecki noted that she "appears quite depressed," "is very anxious," and "seemed to be sincere in wanting to do better."[8] (Id. at 62). He stated that her "[j]udgment is marginal" that she has "significant anger problems" and that her "short term memory appears to be somewhat impaired remembering two out of three objects for three minute testing." He also said "[t]here was some pressure of

_____

[8] He also stated that Plaintiff "admitted symptoms of very severe depression including extreme levels of anxiety, insomnia, low energy, temper outburst, irritability, poor concentration, shakiness, fear of hurting others with quite a bit of hopelessness, fatigue, worthlessness, loneliness, crying, suspiciousness and suicidal ideation with a moderate amount of

12

speech, no flight of ideas, loose associations or tangential thinking." (Id.).

Finally, on March 27, 2008, Plaintiff was seen by Dr. Radecki at Clarion Psychiatric Hospital, and was assigned a GAF score of 25. (Doc. No. 5-9 at 7). Plaintiff complained that she "can't handle all the stress. I'm afraid I might hurt myself." (Id.). Dr. Radecki noted that Plaintiff was having suicidal thoughts upon admission and that she had been "having insomnia with nightmares" and felt "hopeless and helpless with easy crying during assessment and pressure of speech." (Id.). She relayed that her medication wasn't working and that she felt it was making her worse. (Id. at 4). During the mental status examination, Dr. Radecki observed that Plaintiff "definitely appears depressed and tearful," "presents herself well," and "seems sincere." (Id. at 6). He noted that "[h]er short term memory may be slightly impaired remembering two out of three objects on three minute testing" and that her "[m]otor activity is one of some mild psychomotor retardation." (Id.). He noted that there was "no pressure of speech, flight of ideas, loose associations, or tangential thinking" and that her insight and judgment was "fair." (Id.). He indicated that she "has not been able to keep follow up appointments since last hospitalization." (Id.).

Although the ALJ stated that he gave "great weight" to the

sadness." (Id. at 62).

clinical data contained in Plaintiff's mental health treatment records, he failed to discuss specifically the seven low GAF scores contained in those records and did not reference any of the treatment notes that explained the bases for the scores. The ALJ also neglected to explain how Plaintiff's low GAF scores were consistent with his finding of non-disability. See Benton for Benton v. Bowen, 820 F.2d 85, 88 (3d Cir. 1987).

Courts, especially in this Circuit, consistently have held that an ALJ's failure to specifically discuss low GAF scores in his determination constitutes grounds for a remand. Irizarry, 233 Fed. Appx. at 192; Lust v. Comm'r of Soc. Sec., 2010 WL 2773205, at *5 (W.D. Pa. July 13, 2010); Dougherty v. Barnhart, 2006 WL 2433792, at *10 (E.D. Pa. Aug. 21, 2006); Pounds v. Astrue, 772 F.Supp.2d 713, 726 (W.D. Pa. 2011); Metz v. Astrue, 2010 WL 3719075, at *14 (W.D. Pa. Sept. 17, 2010); West, 2010 WL 1659712, at *7; Wiggers, 2010 WL 1904015, at *9.

Moreover, the present case easily is distinguishable from Rios, 444 Fed. Appx. at 535 and Gilroy v. Comm'r of Soc. Sec., 351 Fed. Appx. 714, 716 (3d Cir. 2009), where the United States Court of Appeals for the Third Circuit held that a remand was not warranted despite the ALJ's failure to discuss the GAF scores in the record. In Rios, the ALJ failed to discuss two GAF scores of 50, however, there were three GAF scores in the record and he did make specific reference to the consultative examiner's GAF score

14

of 50-55. 444 Fed. Appx. at 535. In finding no error, the Third Circuit reasoned that the "ALJ was not 'cherry-picking' or ignoring medical assessments that ran counter to her finding" and instead "used a score that . . . reflect[ed] Rios's therapist's and doctors' notes that his symptoms ranged from moderate to severe." Id.

Likewise, in Gilroy, the Third Circuit held that the ALJ's failure to discuss a treating psychiatrist's "*one-time rating* of GAF 45" did not warrant a remand because (1) the ALJ "made repeated references to observations from [the psychiatrist]'s report," (2) the reports did not "express any opinions regarding specific limitations," and (3) the reports did not explain the basis for the GAF rating. 351 Fed. Appx. at 716 (emphasis added). Additionally, the Court found that the ALJ adequately explained "his views on the degree of [the plaintiff]'s limitations with respect to social and occupation functioning" and that his conclusion that the plaintiff's "social anxiety limits her ability to interact with supervisors, coworkers, and precludes interaction with the public" was not in conflict with the treating psychiatrist's GAF rating.[9] Id.

Here, the ALJ overlooked seven GAF scores, six of which

---

[9] The Court acknowledges that the ALJ did limit Plaintiff's ability to interact with coworkers, supervisors, and the public; however, the fact that he did not even allude to the low GAF scores prevents this Court from determining whether he factored

15

reflected scores of 50 or below.[10] He did not make "repeated references" to any specific observations noted in any of the treating psychiatrists' reports, which unlike the report in Gilroy, did contain explanations that outlined the basis for each score. Nor did he choose to discuss one out of a few GAF scores that nevertheless reflected Plaintiff's therapists' and doctors' notes that her symptoms were severe, like the ALJ in Rios. While he did note that Plaintiff was described as having "significantly severe symptoms," this characterization of her treatment notes is insufficient because his discussion was carried on as if no GAF scores existed in the record at all.

While Plaintiff acknowledges and concedes that the low GAF scores do not, in and of themselves, establish disability, she argues that "they are clearly relevant evidence that an ALJ may not properly overlook or misrepresent . . . ." Plaintiff's Brief in Support of Summary Judgment (Doc. No. 9 at 12) (emphasis in original). The Court agrees and declines to accept the Defendant's invitation to supply the missing explanation for why the ALJ failed to specifically acknowledge these low scores. This Court cannot surmise the reason(s) why the ALJ discounted their importance because to do so would violate the *Chenery* doctrine.

them in when he made his RFC determination.

[10] "A GAF score of 50 reflects a serious limitation on a persons [sic] ability to perform basic life skills." Warfield v. Astrue, 2011 WL 5374439, at *4 (W.D. Ark. Oct. 13, 2011) (citing

See Fargnoli, 247 F.3d at 44, n.7 (quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)) ("[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.")).

The ALJ certainly was free to give less weight to the low GAF scores; he was, however, obligated to acknowledge their existence in the record and was required to explain why they did not conflict with his determination in order to enable meaningful judicial review. See Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). His failure to discuss and resolve the seven GAF scores with his finding of non-disability - especially in light of the fact that six of them were extremely low[11] - precludes this Court from determining whether he "seriously considered and weighed the importance of [Plaintiff's low GAF] scores" and constitutes grounds for a remand. Dougherty, 2006 WL 2433792, at *10.

Plaintiff's second contention regarding the ALJ's finding that she was able to maintain regular attendance is well-taken. Plaintiff asserts that the ALJ's RFC determination and accompanying hypothetical to the vocational expert ("VE") are inadequate as a matter of law because the ALJ failed to address her "inability to maintain regular attendance due to frequent hospitalizations and consistent testimony describing days when she

---

Breuggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003).
[11] Plaintiff received one GAF score of 20, one GAF score of 25, two

did not leave her home."   (Doc. No. 9 at 17).

In his decision, the ALJ did acknowledge that "[t]he record shows that the claimant has had several psychiatric hospitalizations" and noted that he considered those hospitalizations "in determining the Residual Functional Capacity within."   (R. 15).   He concluded that while Plaintiff "has certain limitations,"[12] he found that her "symptoms were not of such severity as to preclude her from working at a job within the Residual Functional Capacity that I have determined."   (Id.)   The ALJ also recited that at the hearing, Plaintiff's representative "asked the [VE] to assume that the hypothetical individual would not show up for work approximately once a week and whether this factor would affect the [VE]'s testimony."   (Id. at 20).   While the ALJ did acknowledge the VE's testimony that such a limitation would preclude the performance of substantial gainful activity, he explicitly stated that the "proposed limitation is not found within the record" and that he "considered the record as it exists to determine the within Residual Functional Capacity."   (Id.)

Nevertheless, the record contains evidence of periods of isolation and frequently missed doctor appointments that were left unaddressed by the ALJ; the ALJ completely omitted the portion of Plaintiff's testimony where she indicated that she did not leave

---

GAF scores of 30, and two GAF scores of 50.
[12] The Court notes that he never elaborated on what these "certain limitations" were.

18

the house for 3 ½ weeks in January of 2008, approximately 20 days in February of 2008, and that this type of confinement had been going on "all her life." Hearing Transcript (Doc. No. 5-2 at 39-40). This was improper. See Bryan v. Comm'r Soc. Sec, 383 Fed. Appx. 140, 149 (3d Cir. 2010) (the ALJ's "[f]ailure to take into account specific parts of [Plaintiff]'s testimony gives us pause."); see also Richmond v. Chater, 1996 WL 467653, at *4 (7th Cir. 1996) (an "ALJ may not select and discuss only that evidence that favors his ultimate conclusion . . . .").

While the Court offers no opinion as to whether the ALJ erroneously concluded that Plaintiff could maintain regular attendance, it is the lack of discussion regarding the above-cited evidence that is disconcerting. On remand, the ALJ is encouraged to (1) include in his discussion the evidence outlined above, (2) reconcile it with his findings, and (3) further explore whether Plaintiff's mental impairments *require* her to undergo frequent hospitalizations, See, e.g., Kangas v. Bowen, 823 F.2d 775, 778 (3d Cir. 1997), or otherwise preclude her from maintaining regular attendance (e.g., whether her apparent inability to regularly keep appointments and remain compliant with her medications and/or treatment affects her ability to sustain full-time employment).[13]

---

[13] The Court also notes that despite the fact that the ALJ found that Plaintiff had moderate limitations in concentration, persistence, or pace, he did not specifically account for this

## V.    Conclusion[14]

limitation in his RFC determination or in his hypothetical to the
VE.  The only mental limitations imposed directed that Plaintiff
was to have "limited and superficial interaction with supervisors,
co-workers and the public while being precluded from tasks that
involve: arbitration, negotiation, confrontation and supervision."
(R. 16).  This limitation obviously is not tantamount to and does
not account for a restriction that limits Plaintiff to simple,
routine tasks.  Cf. Menkes v. Astrue, 262 Fed. Appx. 410, 412 (3d
Cir. 2008) ("Having previously acknowledged that Menkes suffered
moderate limitations in concentration, persistence and pace, the
ALJ [properly] accounted for these mental limitations in the
hypothetical question by restricting the type of work to "simple
routine tasks."); McDonald v. Astrue, 293 Fed. Appx. 941, 946-47
(3d Cir. 2008) (noting that the ALJ properly accounted for his
finding that the plaintiff had moderate limitations in
concentration by limiting him to simple, routine tasks).  On
remand, the ALJ should take this limitation into account when
determining Plaintiff's RFC and when posing his hypothetical to
the VE.

[14] As a final matter, the Court notes that in finding Plaintiff's
mental impairments to be non-disabling, the ALJ appeared to place
a good deal of reliance on Plaintiff's compliance with her
treatment.  In his RFC determination, the ALJ noted that Plaintiff
"made some progress with her mental health treatment as long as
she remained compliant with treatment" and stated that she
"appears to only make progress when she is compliant with
treatment."  (Doc. No. 5-2 at 18).  Significantly, the ALJ found
that Plaintiff's bipolar disorder constituted a severe impairment.
 (R. 12).  As the United States Court of Appeals for the Seventh
Circuit has explained:

> [I]t is true that bipolar disorder is treatable by
> drugs. But mental illness in general and bipolar
> disorder in particular (in part because it may require a
> complex drug regimen to deal with both the manic and the
> depressive phases of the disease . . . may prevent the
> sufferer from taking her prescribed medicines or
> otherwise submitting to treatment . . . The
> administrative law judge did not consider this
> possibility.

Kangail v. Barnhart, 454 F.3d 627, 630-31 (7th Cir. 2006).
Indeed, courts have recognized that "non-compliance is a hallmark

In short, substantial evidence does not support the ALJ's determination of non-disability in this case because his failure to discuss the seven low GAF scores in the record prevents this Court from determining whether he gave them any consideration in finding that Plaintiff was able to sustain regular, full-time employment. The Court hereby remands this case to the Commissioner for reconsideration consistent with this Order.

s/Alan N. Bloch
United States District Judge

ecf:    Counsel of record

---

of bipolar disorder, particularly when the person is in the manic phase." Pounds, 772 F.Supp.2d at 723, n.21; Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011) ("[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently."); Howard v. Astrue, 2010 WL 1372662, at *6 n.2 (W.D. Okla. Mar. 9, 2010) (noting that "[n]oncompliance with medication is a very common feature among bipolar patients. Rates of poor compliance may reach 64% for bipolar disorders, and noncompliance is the most frequent cause of recurrence.") (internal quotations and citations omitted). Thus, on remand, the ALJ should consider the effect that her bipolar disorder has on her ability to comply with her mental health treatment and whether any inability to maintain compliance affects her ability to sustain regular employment.